# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| PUBLIX SUPER MARKETS, INC., | Case No. 8:22-cv-2569-CEH-AEP |
| Plaintiff, | |
| v. | Hon. Charlene Edwards Honeywell |
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY, et al., | |
| Defendants. | |

**PUBLIX SUPER MARKETS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE 2013 INSURERS' DEFENSE OBLIGATION**

**DECLARATORY RELIEF REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF UNDISPUTED FACTS ...........................................4

I.     Publix and Its Liability Insurance Program ...................................4

II.    The 2013 Policies .............................................................................5

    A.   The 2013 Policies Provide Coverage for Damages "Because of" Bodily Injury Arising out of Publix's Sale of Prescription Medications ..............7

        1.   The Druggists Policy ....................................................7

        2.   The ACE Excess Policy ................................................8

    B.   The 2013 Policies Obligate the Insurers to Pay Publix's Defense Costs or Provide That the Insurers Have a Duty to Defend Publix.......................9

    C.   The 2013 Policy Exclusions.................................................10

    D.   The Opioid Exclusion Added to the ACE Policies in 2018...................11

III.   The Opioid Lawsuits ......................................................................12

    A.   The Opioid Lawsuits Extensively Allege "Bodily Injury" ...................13

    B.   The Opioid Lawsuits Allege Both Non-Intentional and Intentional Conduct............................................................................18

    C.   The Opioid Lawsuits Include Specific Allegations of Care Provided by the Plaintiffs to Individuals................................................19

IV.    The Insurers' Refusal to Provide Coverage ....................................20

ARGUMENT ........................................................................................20

I.     Legal Standards ...............................................................................20

    A.   Summary Judgment Standard .............................................20

    B.   Principles of Insurance Policy Interpretation .......................21

II.    The Insurers Have an Obligation to Defend or Pay Publix's Defense Costs in the Opioid Lawsuits ..........................................................23

    A.   The Opioid Lawsuits Allege Damages "Because of Bodily Injury" .......24

        1.   The Better-Reasoned Decisions from Across the Country Support Publix's Position ......................................................27

        2.   The Contrary Authority, Including *Anda*, Is Distinguishable or Poorly Reasoned and Should Not Be Followed .........................32

        3.   If the Policies Are Ambiguous, Publix Is Entitled to Coverage....40

    B.   The Opioid Litigations Satisfy the Definition of "Occurrence" .............41

    C.   The Expected/Intended Exclusion Does Not Apply to Preclude Defense Coverage.............................................................................44

CONCLUSION ................................................................45

## TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*ACE American Insurance Co. v. Rite Aid Corp.*,
   270 A.3d 239 (Del. 2022) ..............................................*passim*

*Acuity v. Masters Pharmaceutical, Inc.*,
   ___ N.E.3d ___, 2022 WL 4086449, 2022-Ohio-3092 (Ohio Sept. 7, 2022) .........................................................................*passim*

*Addison Ins. Co. v. 4000 Island Blvd. Condominium Ass'n, Inc.*,
   721 F. App'x 847 (11th Cir. 2017)........................................22

*AIU Insurance Co. v. McKesson Corp.*,
   598 F. Supp. 3d 774 (N.D. Cal. 2022) ..........................29, 30, 31, 43

*Allstate Ins. Co. v. Steinemer*,
   723 F.2d 873 (11th Cir. 1984) ...........................................42

*AmerisourceBergen Drug Corp. v. ACE American Insurance Co.*,
   2020 W. Va. Cir. LEXIS 3 (Jan. 7, 2021) ............................31, 32, 39

*Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.*,
   771 So.2d 579 (Fla. 4th DCA 2000) .....................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .....................................................21

*Assurance Co. of Am. v. Lucas Waterproofing Co.*,
   581 F. Supp. 2d 1201 (S.D. Fla. 2008).....................................25

*Auto-Owners Ins. Co. v. Anderson*,
   756 So. 2d 29 (Fla. 2000) ................................................23

*Banks v. City of Brunswick*,
   529 F. Supp. 695 (S.D. Ga. 1981), *aff'd* 667 F.2d 97 (11th Cir. 1982) ...............19

*Carithers v. Mid-Continent Cas. Co.*,
  782 F.3d 1240 (11th Cir. 2015)..........................................................................41

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .........................................................................................21

*Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*,
  829 F.3d 771 (7th Cir. 2016) ....................................................................*passim*

*Cincinnati Insurance Co. v. Richie Enterprises, LLC*,
  2014 WL 3513211 (W.D. Ky. July 16, 2014)..................................33, 34, 35, 37

*FCCI Ins. Co. v. Horne*,
  890 So. 2d 1141 (Fla. 5th DCA 2004) ..............................................................42

*First Mercury Ins. Co. v. First Fla. Bldg. Corp.*,
  2022 WL 4017061 (M.D. Fla. Sept. 2, 2022) ..............................................21, 22

*Garcia v. Fed. Ins. Co.*,
  969 So. 2d 288 (Fla. 2007) ...............................................................................25

*Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*,
  499 F. Supp. 3d 147 (W.D. Pa. 2020), *vacated on other grounds*, 2021
  WL 6276267 (W.D. Pa. May 25, 2021)......................................................32, 43

*Hartford Acc. & Indem. Co. v. Beaver*,
  466 F.3d 1289 (11th Cir. 2006)....................................................................23, 45

*Health Care Industry Liability Insurance Program v. Momence Meadows
  Nursing Center*,
  566 F.3d 689 (7th Cir. 2009) .........................................................33, 34, 35, 37

*Hickson Corp. v. N. Crossarm Co.*,
  357 F.3d 1256 (11th Cir. 2004)........................................................................21

*Jones v. Fla. Ins. Guar. Ass'n, Inc.*,
  908 So. 2d 435 (Fla. 2005) .........................................................................22, 45

*Liberty Mutual Fire Insurance Co. v. JM Smith Corp.*,
  602 F. App'x 115 (4th Cir. 2015)................................................................42, 43

*Medmarc Cas. Ins. Co. v. Avent Am., Inc.*,
  612 F.3d 607 (7th Cir. 2010) ....................................................................*passim*

*Penzer v. Transp. Ins. Co.*,
  545 F.3d 1303 (11th Cir. 2008)..............................................................25

*People's Trust Ins. Co. v. Lamolli*,
  352 So. 2d 890 (Fla. 4th DCA 2022) ...................................................22

*Roberson v. United Servs. Auto. Ass'n*,
  330 So. 2d 745 (Fla. 1st DCA 1976) ...................................................23

*Serendipity at Sea, LLC v. Underwriters at Lloyd's Subscribing to Policy No. 187581*,
  56 F.4th 1280 (11th Cir. 2023) ....................................................22, 23

*State Farm Fire & Cas. Co. v. CTC Dev. Corp.*,
  720 So. 2d 1072 (Fla. 1998)..............................................................44

*State Farm Fire & Cas. Co. v. Steinberg*,
  393 F.3d 1226 (11th Cir. 2004).........................................................22

*State Nat'l Ins. Co. v. White*,
  2011 WL 5024258 (M.D. Fla. Oct. 19, 2011), *aff'd*, 482 F. App'x 434
  (11th Cir. 2012) ..............................................................................21

*Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*,
  658 F. App'x 955 (11th Cir. 2016).......................................3, 24, 34, 35

*Travelers Property Casualty Co. of America v. Anda, Inc.*,
  90 F. Supp. 3d 1308 (S.D. Fla. 2015) ...........................................*passim*

*U.S. Fire Ins. Co. v. J.S.U.B., Inc.*,
  979 So. 2d 871 (Fla. 2007) ..........................................................26, 34

*U.S. Sugar Corp. v. Commerce & Indus. Ins. Co.*,
  ___ F. Supp. 3d ___, 2022 WL 17403613 (S.D. Fla. Dec. 2, 2022)....................22

*Westfield National Insurance Co. v. Quest Pharmaceuticals, Inc.*,
  57 F.4th 558 (6th Cir. 2023) .......................................................*passim*

## Rules

Fed. R. Civ. P. 56(a) ............................................................................20

Plaintiff Publix Super Markets, Inc. ("Publix"), hereby moves this Court for partial summary judgment (the "Motion") for a declaration that Defendants Hartford Fire Insurance Company ("The Hartford"), Liberty Mutual Fire Insurance Company ("Liberty Mutual"), ACE Property and Casualty Insurance Company ("ACE"), Great American Insurance Company of New York ("Great American"), Liberty Insurance Underwriters Inc. ("LIUI"), XL Insurance America, Inc. ("XL"), and The Ohio Casualty Insurance Company ("Ohio Casualty," and, collectively, the "Insurers"), have an obligation to provide coverage for Publix's defense costs incurred in dozens of lawsuits filed against Publix related to its sale of opioid medication (the "Opioid Lawsuits") under policies the Insurers issued for the policy period January 1, 2013 to January 1, 2014 (the "2013 Policies" or the "Policies"), subject to their respective retentions and/or deductibles, attachment points, and limits.

## **PRELIMINARY STATEMENT**

Publix owns supermarkets that are a mainstay in communities across the southeastern United States, and those supermarkets contain retail pharmacies that fill prescriptions. Publix buys primary and excess druggists liability insurance to provide coverage in the event it is sued for a claim arising out of its pharmacy operations. Publix realized there was a potential that such a claim or claims could expose it to significant liability, and for that reason it dutifully paid premiums year after year for more than $100 million in coverage each year. Several years ago, state and local governments, reeling from the effects of the opioid epidemic in their localities, began filing the Opioid Lawsuits against entities involved in all stages of the sale of opioids,

from the manufacturers of the opioid medications, to the distributors who circulated the medications, to retail pharmacies like Publix that filled prescriptions for those medications. The plaintiffs alleged that the opioid epidemic had a devastating impact on their communities, causing all manner of injury and disease, including overdose and addiction, and ultimately thousands of deaths.

Publix has vigorously contested its liability in the Opioid Lawsuits and turned to its insurers, including the Insurers implicated in this Motion, for coverage for its defense costs. These are the exact claims that Publix purchased insurance for: the insuring agreements of the 2013 Policies state that coverage will be provided for claims arising out of "bodily injury" allegedly caused by Publix's pharmacy operations. The Insurers, however, have refused to acknowledge any coverage, arguing that the Opioid Lawsuits do not seek damages "because of" "bodily injury" as defined in the policies they sold to Publix, and arguing that because there are allegations that Publix acted intentionally in filling opioid prescriptions, coverage is unavailable on that basis also.

These issues are not unique to Publix: the language in the 2013 Policies has been used by these Insurers and others for many years and in policies sold to many other policyholders, including other defendants in the Opioid Lawsuits. Several federal and state courts from across the country have had a chance to address these issues, and a split of authority has formed: several courts have found that there is coverage for allegations like those in the Opioid Lawsuits under the same policy language used in the 2013 Policies, and several courts have found there is no coverage for such claims. Neither the Supreme Court of Florida nor the Eleventh Circuit has ruled on these

issues. While there is one Florida district court decision addressing policy language providing coverage for claims asserting damages "because of bodily injury" for opioid liabilities—*Travelers Property Casualty Co. of America v. Anda, Inc.*, 90 F. Supp. 3d 1308 (S.D. Fla. 2015)—that case is factually distinguishable from this case, and on appeal, the Eleventh Circuit expressly declined to reach the "because of bodily injury" question under circumstances that appear to indicate it disagreed with the district court's finding. *See Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*, 658 F. App'x 955, 958 (11th Cir. 2016).

Publix therefore seeks a ruling from this Court that the Opioid Lawsuits are a claim for damages "because of" "bodily injury" as defined in the 2013 Policies. Publix limits this Motion to the 2013 Policies in order to streamline motion practice before this Court, and because a ruling on this issue has the potential to significantly simplify this litigation going forward. Under Florida law, the Insurers' defense obligation is assessed by comparing the allegations in the Opioid Lawsuits to the language of the 2013 Policies, all of which are undisputed, so this issue is ripe for resolution at this early stage as a matter of law. Because the Opioid Lawsuits allege every manner of bodily injury as defined in the 2013 Policies arising out of the opioid epidemic—bodily injury, sickness, disease, and death—as well as unintentional conduct by Publix in filling prescriptions without intending to cause the injuries that resulted, Publix respectfully requests that the Court grant its Motion and enter judgment that its defense costs related to the Opioid Lawsuits are covered under the 2013 Policies, subject to their respective retentions and/or deductibles, attachment points, and limits.

## STATEMENT OF UNDISPUTED FACTS

### I.   PUBLIX AND ITS LIABILITY INSURANCE PROGRAM

Publix is the largest employee-owned company in the United States and one of the ten largest volume-supermarket chains in the United States. Decl. of Kenneth H. Frenchman in Supp. of Publix's Mot. ¶ 2 ("Frenchman Decl."). At present, Publix operates more than 1,300 stores in Florida, Georgia, Alabama, South Carolina, Tennessee, North Carolina, and Virginia. Publix also operates ten distribution centers and ten manufacturing facilities. *Id.* ¶ 3. At many of its stores, Publix operates retail pharmacies that fill prescriptions for, among other things, opioid medications. *Id.* ¶ 4.

To protect itself from the various risks of claims being made against it arising out of its operations, at all times relevant hereto, Publix maintained a comprehensive liability insurance program. *Id.* ¶ 5. Throughout the period of alleged wrongdoing in the Opioid Lawsuits, Publix maintained "towers" of insurance coverage in effect from January 1 of one year to January 1 of the next year, comprised of primary insurance policies that provide coverage upon exhaustion of a self-insured retention and/or deductible, umbrella policies that sit above the primary policies, and excess policies that sit above the umbrella policies. *Id.* ¶ 6. Reflective of the liabilities Publix could face, the amount of coverage in a given year regularly exceeded $100 million. *Id.* ¶ 7.

While on information and belief the terms and conditions of all of the potentially implicated policies are substantially similar, this Motion seeks a declaration as to the 2013 Policies to streamline the issues before the Court and to obtain a ruling that will be instructive with respect to all potentially implicated policies.

## II.   THE 2013 POLICIES

For the January 1, 2013 to January 1, 2014 policy period, Publix purchased the following Policies that formed the "tower" of liability coverage for that policy period, providing $180 million in total limits of liability per "occurrence" and in the aggregate:

| **Layer** | **Insurer and Policy Number** | **Limits of Liability** | **Ex. No.[1]** |
|---|---|---|---|
| Self-Insured Retention | N/A | $1.9 million | N/A |
| Primary (Fronting) | The Hartford Policy No. 20 ECS D70778 (the "Druggists Policy") | $100,000 excess of $1.9 million with $100,000 deductible | 1 |
| Umbrella | Liberty Mutual Policy No. TH2-651-286611-013 (the "Liberty Mutual Umbrella Policy") | $3 million excess of $2 million | 2 |
| 1st Layer Excess | ACE Policy No. XOO G27049539 (the "ACE Excess Policy") | $25 million excess of $5 million | 3 |
| 2nd Layer Excess | Great American Policy No. EXC 4645853 | $25 million excess of $30 million | 4 |
| 3rd Layer Excess | LIUI Policy No. 1000026300-10 | $50 million excess of $55 million | 5 |
| 4th Layer Excess | XL Policy No. US00007634LI13A | $25 million excess of $105 million | 6 |
| 5th Layer Excess | Ohio Casualty Policy No. ECO (14) 53 16 31 32 | $25 million excess of $130 million | 7 |

---

[1] All exhibits referenced herein are attached to the Frenchman Declaration.

| 6th Layer Excess | National Surety Corporation Policy No. SHX-000-4868-5002 | $25 million excess of $155 million | N/A[2] |

The Druggists Policy is a "fronting" policy: its limit is available after Publix has exhausted the self-insured retention, but it has a deductible equal to the policy limit and provides that Publix must reimburse amounts received under the Policy up to the amount of the deductible. *See* Ex. 1 at Endorsement ("Endt.") 4. Real risk-transfer insurance begins to be provided at the next level of the tower with the Liberty Mutual Umbrella Policy. The Liberty Mutual Umbrella Policy adopts most of the terms, definitions, conditions, and exclusions of the Druggists Policy except for a handful of specific provisions for which the provisions of the Liberty Mutual Umbrella Policy apply. *See* Ex. 2 at Endt. 12. Above the Liberty Mutual Umbrella Policy, the ACE Excess Policy has its own terms and conditions, and the excess Insurers above it follow those terms and conditions, with the exception of premiums, limits of liability, attachment points, and certain specific endorsements.[3] Thus, the following sections will focus on the language in the Druggists Policy and the ACE Excess Policy and will only discuss the terms of the Liberty Mutual Umbrella Policy when they deviate from the terms of the Druggists Policy.

---

[2] Publix is not making this Motion against National Surety Corporation due to its pending motion to dismiss the Amended Complaint, which Publix has opposed. *See* ECF Nos. 128, 150, 164.

[3] *See generally* Ex. 3 (ACE Excess Policy terms and conditions); *see also* Ex. 4 at Following Form Coverage Endt. (stating that insurance is provided in accordance with the insuring agreements, exclusions, definitions, and conditions in the ACE Excess Policy except in specified situations); Ex. 5 at Endt. 8 (same); Ex. 6 at Endt. 4 (same); Ex. 7 at Following Form Endt. (same).

**A.** **The 2013 Policies Provide Coverage for Damages "Because of" Bodily Injury Arising out of Publix's Sale of Prescription Medications**

**1.  The Druggists Policy**

The Druggists Policy's Insuring Agreement provides:

a. Our obligation to pay, on [Publix's] behalf, those damages and "claim expenses" [Publix] become[s] legally liable to pay because of "bodily injury" arising out of the "druggists products hazard:"

> (1) Is limited to the Limits of Liability also set forth in the Declarations; and
>
> (2) Applies only to the extent that such damages and "claim expenses" payable by us in (1) are in excess of the "self-insured retention" that has been exhausted solely by [Publix's] payment of that portion of judgments, settlements or "claim expenses" to which this policy would have applied in the absence of the "self-insured retention."

Ex. 1 at § I(1)(a).

The Druggists Policy defines "druggists products hazard," in relevant part, as "[a]ll 'bodily injury' occurring away from premises [Publix] own[s] or rent[s] and arising out of 'your druggists product' except products that are still in [Publix's] physical possession . . . ." *Id.* at Endt. 5. It defines "your druggists product," in relevant part, as "[p]rescription drugs and medicines prepared, sold, handled distributed or disposed of by [Publix] from [Publix's] 'insured retail drug operations' . . . ." *Id.* at § V(21). Additionally, the Druggists Policy applies "to 'bodily injury,' . . . if: (1) The 'bodily injury' is caused by an 'occurrence' that takes place in the 'coverage territory;' and (2) The 'bodily injury' occurs during the 'policy period.'" *Id.* at § I(1)(e).

The Druggists Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of

these at any time." *Id.* at § V(2). The Druggists Policy defines "occurrence," with respect to "bodily injury," as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at § V(15). Though the Druggists Policy does not define the term "damages," it provides that claims asserting damages that are covered under the Druggists Policy can be brought by any person or organization: "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'" *Id.* at § I(1)(f).

### 2. The ACE Excess Policy

The relevant insuring agreement for the ACE Excess Policy is found in Endorsement 21 of that Policy, which provides that ACE will pay "all sums in excess of the 'retained limit' that the 'insured' shall become legally obligated to pay as damages because of 'bodily injury' arising out of a 'pharmacist liability incident' that takes place during the 'policy period.'" Ex. 3 at Endt. 21. Endorsement 21 of the ACE Excess Policy identifies the limits of the Druggists Policy and the Liberty Mutual Umbrella Policy as the "retained limit." *Id.*

Endorsement 21 defines "pharmacist liability incident," in relevant part, as "any actual or alleged negligent act, error or omission, misstatement or misleading statement committed by the 'insured' in the performance of a 'pharmacist professional service.'" *Id.* It defines "pharmacist professional service" as:

> [T]he manufacture, preparation, selling, handling or distribution of drugs, medicine, other goods or products and their containers by the "insured" at or from any pharmacy, drug store or mail order

8

pharmaceutical distribution and mail order processing facility. "Pharmacist professional services" also include consultation, diagnostic, referral, or similar services as a pharmacist, including blood tests, prescribing or administering of any drugs or vaccinations and managing drug therapy, as required or permitted under any applicable statutes.

*Id.*

The ACE Excess Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. 'Bodily injury' includes mental anguish or mental injury resulting from bodily injury." *Id.* at § VII(C). The ACE Excess Policy defines "occurrence," with respect to "bodily injury," in relevant part, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at § VII(O). Like the Druggists Policy, the ACE Excess Policy does not define "damages," but it provides that covered claims can be brought by any person or organization: "Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'" *Id.* at § I(D).

## B. The 2013 Policies Obligate the Insurers to Pay Publix's Defense Costs or Provide That the Insurers Have a Duty to Defend Publix

The Druggists Policy provides that The Hartford has an "obligation to pay, on [Publix's] behalf, . . . 'claim expenses' [Publix] become[s] legally liable to pay," Ex. 1 at § I(1)(a), and specifically defines "claim expenses" as "expenses incurred in the . . . defense of 'suits.'" *Id.* at § V(4).

Both the Liberty Mutual Umbrella Policy and the ACE Excess Policy provide that those Insurers have a duty to defend Publix when those Policies' attachment

9

points are reached. The Liberty Mutual Umbrella Policy provides that Liberty Mutual has "the right and duty to defend any 'suit' seeking damages covered by this insurance" when underlying insurance is exhausted or does not cover the suit. Ex. 2 at § I(1)(b). The ACE Excess Policy also provides that, upon the exhaustion of underlying coverage, ACE has a "right and duty to defend the 'insured' against any 'suit' seeking damages for 'bodily injury' . . . even if groundless, false or fraudulent . . . ." *Id.* at § III(A). The excess 2013 Policies above the ACE Excess Policy follow form to its defense provisions. *See supra* n.3.

### C. The 2013 Policy Exclusions

The 2013 Policies have a number of exclusions, certain of which have been raised by the Insurers as defenses to coverage for Publix's claim, as well as other exclusions not implicated by the facts of the claim but useful in shedding light on the operation of the terms that are implicated by this claim. The Druggists Policy's "Expected or Intended Injury" exclusion provides: "This policy does not apply to: . . . Any injury . . . expected or intended from the standpoint of the insured." Ex. 1 at § I(2)(a). The ACE Excess Policy's "Expected or Intended Injury" exclusion is similar: "This insurance does not apply to: . . . 'Bodily injury' . . . expected or intended from the standpoint of the 'insured'." Ex. 3 at § V(K).

The Policies also have pollution exclusions that specifically exclude claims by governmental authorities. The Druggists Policy's pollution exclusion provides that the Policy does not apply to any:

> (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

Ex. 1 at § I(2)(f)(2). The ACE Excess Policy has the exact same language in its pollution exclusion. Ex. 3 at Endt. 20.

### D. <u>The Opioid Exclusion Added to the ACE Policies in 2018</u>

Beginning in 2018, certain of Publix's policies include opioid exclusions that specifically target the types of liabilities Publix faces in the Opioid Lawsuits. For example, ACE Umbrella Plus Commercial Umbrella Liability Policy No. G27933488 003, with a policy period of January 1, 2018, to January 1, 2019, to which the other 2018 excess policies follow form, contains a substantively identical insuring agreement and provisions concerning "bodily injury" as the 2013 Policy, *see* Ex. 8 at Endt. 25, but also contains an endorsement that "CHANGES THE POLICY" and provides:

> This insurance does not apply to:
>
> **OPIOIDS AND NARCOTICS**
>
> 1. Any "claim" made by or on behalf of any "governmental entity", health or group insurer and/or union or like representative entity arising out of or related to actual or alleged "opioid and narcotics liability"; and
>
> 2. "Opioid and narcotics liability" arising out of or relating to any actual or alleged violation or nonconformance with the Controlled Substance Act or any similar act, statute, regulation, ordinance, requirement or law of a "governmental entity" by any "insured."

*Id.* at Endt. 24. The exclusion goes on to define "Opioid and narcotics liability" to include damages arising out of the alleged diversion of opioids and failure to maintain sufficient controls to prevent diversion or report diversion. *Id.*

### III.    THE OPIOID LAWSUITS

As the abuse of opioids turned into a nationwide epidemic, local governments faced increased costs associated with the treatment of opioid addiction and overdose. *See, e.g.*, Ex. 9 ¶ 19. As the costs mounted, local governments (as well as other impacted parties, such as individuals and healthcare providers) began to file lawsuits against parties they believed to be responsible for the opioid epidemic. *See generally id.* These parties included the pharmaceutical companies that manufactured the opioids and engaged in aggressive marketing practices to establish and grow the market for them, and "pill mill" pain clinics that wrote prescriptions for individuals regardless of their medical need. *See, e.g., id.* ¶¶ 3, 16. The suits have also named as defendants retail pharmacies that filled prescriptions, and, as an operator of retail pharmacies, Publix has been named in dozens of Opioid Lawsuits. Exs. 9–11, 19–140.

In December 2017, the United States Judicial Panel on Multidistrict Litigation consolidated numerous lawsuits filed against a wide array of defendants in the case *In re National Prescription Opiate Litigation* (MDL No. 2804) (the "Opioid MDL"). The Opioid MDL is pending in the U.S. District Court for the Northern District of Ohio. The Opioid MDL has focused on "bellwether" cases, and Publix is named in one such bellwether suit, *Cobb County v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-45817 (the "Cobb County Action"). *See* ECF No. 152 at 6–7. Publix is actively litigating the Cobb County Action, while all other Opioid Lawsuits against Publix are currently stayed. *See id.* This Motion therefore focuses on the Cobb County Action, but the allegations in the other Opioid Lawsuits are substantially similar, even identical in some places,

to the Cobb County allegations. *See generally, e.g.*, Exs. 9–11, 19–140. Publix has incurred millions of dollars in defense costs defending against the allegations in the Opioid Lawsuits. Frenchman Decl. ¶ 8.

Cobb County initially filed its complaint on June 12, 2018 (the "Original Complaint" or "Orig. Compl.," Ex. 9). On March 15, 2019, Cobb County added Publix as a defendant by way of a Short Form for Supplementing Complaint and Amending Defendants and Jury Demand (the "2019 Short Form," Ex. 10). On May 19, 2021, Cobb County expanded the allegations against Publix in Supplemental and Amended Allegations (the "Supplemental Allegations" or "Supp. Alleg.," Ex. 11, and, collectively, the "Complaints"). In addition to the allegations asserted therein, the Supplemental Allegations expressly incorporate all of the allegations in the Original Complaint and the 2019 Short Form. Supp. Alleg. ¶ 3.

### A. <u>The Opioid Lawsuits Extensively Allege "Bodily Injury"</u>

The Supplemental Allegations describe the Cobb County Action as arising from "the worst man-made epidemic in modern medical history—an epidemic of addiction, overdose and death caused by Defendants' flooding the United States, including Plaintiff's community with prescription opioids." *Id.* ¶ 4. Cobb County alleges that it has been hit "particularly hard" by the opioid epidemic, including by consistently ranking at or near the top of the State of Georgia in overdose deaths, and alleges that government resources have been stretched "to the breaking point." *Id.* ¶ 7. The effects of the opioid epidemic are felt widely, and Cobb County alleges that "there has been almost no area of the community that has not been significantly impacted." *Id.* ¶ 15.

The County alleges:

> The opioid crisis has reshaped daily reality for Cobb County in numerous ways, including but not limited to increased and intensified emergency medical responses to overdoses; increased drug-related offenses affecting law enforcement, jails, and courts; enormous resources spent on community and social programs to treat those with opioid use disorders; higher workers' compensation costs for prescription opioids and opioid-related claims; and ultimately prevalent opioid abuse throughout the County, including in public places.

*Id.* ¶ 715. It claims that it "seeks to hold accountable the Chain Pharmacies"—which include Publix—that allegedly "reaped enormous financial rewards by helping to expand the market for prescription opioids beyond all reasonable limits, by failing to comply with their gatekeeping obligation to protect the public, and by refusing to monitor and restrict the improper sale and distribution of opioids, causing a public nuisance in the Cobb County community." *Id.* ¶ 2. Allegations specific to Publix state that orders of opioid medications grew to high levels and were not checked, and that Publix knew or should have known this was leading to diversion and abuse. *Id.* at 129–38.

The Cobb County Action contains extensive allegations of every type of bodily injury defined by the Policies, including "bodily injury," "sickness or disease," and "mental anguish." *See id.* ¶ 746 (alleging "a staggering increase in . . . injuries" as a result of the opioid epidemic).[4] The Introduction of the Supplemental Allegations describes "necessary and costly responses to the opioid crisis," including:

---

[4] The Cobb County Action alleges that Publix engaged in conduct that contributed to the opioid epidemic during the policy period of the 2013 Policies. The Supplemental Allegations allege that the

> [T]he handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

*Id.* ¶ 23.

The Complaints allege in detail that opioid medication is addictive, that people become and remain addicted to opioids, and that opioid addiction can lead to other kinds of addiction, including to heroin and fentanyl. *See* Orig. Compl. ¶¶ 6, 17 (alleging "skyrocketing addiction"), 612, 616 ("Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high.").[5] In fact, the Original Complaint alleges that individuals addicted to prescription opioids are forty times more likely to be addicted to heroin. *Id.* ¶ 617. The Supplemental Allegations note that, "[a]s of 2017, an estimated 180,000 Georgians have an opioid use disorder." Supp. Alleg. ¶ 708. Disease caused by the opioid epidemic extends beyond addiction: "According to the CDC, an increase in Hepatitis C in the United States is directly tied to intravenous injection of opioids." Orig. Compl. ¶ 625.

---

conduct for which it is seeking to hold the defendants liable began "in the late 1990s," and that Publix distributed and sold prescription opioids in Cobb County and elsewhere "[a]t all times relevant to" the Complaints. *Id.* ¶¶ 9, 83. The 2019 Short Form alleges that, based on available data, "drugs sold and distributed by Publix represent a substantial market share in [Cobb County] from at least 2006-2014." 2019 Short Form ¶ 158.

[5] The Centers for Disease Control and Prevention ("CDC") have long held that addiction is a disease. *See, e.g.*, "Stigma Reduction," CDC, available at https://www.cdc.gov/stopoverdose/stigma/index.html (last visited on Mar. 31, 2023). The opioid epidemic has led to the diagnosis of a specific disease based on opioid addiction, known as opioid use disorder. *Id.*

Moreover, the Complaints allege that the opioid epidemic has manifested in opioid overdoses that strain Cobb County's public health and emergency response networks. *See id.* ¶ 17 ("The increased volume of opioid prescribing correlates directly to . . . overdose . . . ."). The allegations describe increased emergency room visits and other emergency treatment provided by the County in response to overdoses, including use of the overdose-reversal drug naloxone. *See id.* ¶ 624;

The Complaints allege that children in Georgia have not been spared the effects of the epidemic. The Original Complaint alleges that children have been "physically injured" because they "ha[d] access to opioids, nearly all of which were prescribed or supplied to adults in their household[.]" *Id.* ¶ 626. Additionally, the Complaints contain allegations of "[i]nfants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts," Supp. Alleg. ¶ 746, and children needing "years of long-term care and monitoring due to [Neonatal Abstinence Syndrome ('NAS')]." *Id.* ¶ 718.

> These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. . . . [R]esearch . . . has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening. In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

Orig. Compl. ¶ 627.

Finally, the Complaints are replete with allegations about the grim death toll the opioid epidemic has taken across the country, the State of Georgia, and Cobb County. *See id.* ¶¶ 4–5 (describing a steadily mounting death toll and alleging that "[f]rom 1999 through 2016, overdoses killed more than 350,000 Americans"), 17, 612, 620. The Original Complaint explains that from 1999 to 2016, more people died in the U.S. from overdoses related to prescription opioids than the number of Americans who died in the Vietnam War. *Id.* ¶ 5; *see also* Supp. Alleg. ¶¶ 703–04. Beyond deaths from overdoses or long-term complications, the Complaints allege that suicides are believed to be related to opioid withdrawal. Orig. Compl. ¶ 630.

The other Opioid Lawsuits contain similar, and in many cases identical or nearly identical, allegations about the bodily injury, sickness, disease, and death—*i.e.*, "bodily injury" under Publix's Policies—caused by the opioid epidemic affecting their communities. *See, e.g.*, Compl. ¶ 322, *Coffee County v. AmerisourceBergen Drug Corp.*, No. 1:18-op-45182 (M.D. Ala. Jan. 31, 2018) ("Coffee County Compl.," Ex. 44); Compl. ¶ 324, *Augusta v. AmerisourceBergen Drug Corp.*, No. 1:18-op-45233 (S.D. Ga. Feb. 12, 2018) (Ex. 24); Compl. ¶ 323, *Bay County v. AmerisourceBergen Drug Corp.*, No. 5:18-cv-00086 (N.D. Fla. Apr. 4, 2018) (Ex. 30); Class Action Compl. ¶ 256, *Gwinnett County v. Purdue Pharma L.P.*, No. 1:18-cv-02078 (M.D. Ga. May 11, 2018) (Ex. 56); Compl. ¶ 402, *City of Albany v. AmerisourceBergen Drug Corp.*, No. 1:18-cv-00221 (M.D. Ga. Nov. 20, 2018) ("Albany Compl.," Ex. 19); Compl. ¶ 323, *City of Bradenton v.*

*AmerisourceBergen Drug Corp.*, No. 8:18-cv-02861 (M.D. Fla. Nov. 20, 2018) ("Bradenton Compl.," Ex. 39).

**B. <u>The Opioid Lawsuits Allege Both Non-Intentional and Intentional Conduct</u>**

In the Cobb County Action, the specific allegations against Publix include the alleged failure "to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community." Supp Alleg. ¶ 460; *see also id.* ¶¶ 462 ("Publix failed to implement an effective suspicious order monitoring program."), 472 ("Publix violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion."), 478 ("Publix failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs."), 487 ("Publix lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion.").

One of the causes of action asserted in the Cobb County Action was for negligence, based on the alleged failure "to maintain effective controls over the distribution of prescription opioids." Orig. Compl. at 264. Pursuant to an order in the Opioid MDL, the Supplemental Allegations focused on the cause of action for public nuisance. Supp. Alleg. at 219–25. Public nuisance, under Georgia law, does not

require intentional conduct; in fact, it has been described as the same as negligence, just with repeated conduct on a broader scale. *See Banks v. City of Brunswick*, 529 F. Supp. 695, 702 (S.D. Ga. 1981), *aff'd* 667 F.2d 97 (11th Cir. 1982). The other Opioid Lawsuits include similar allegations of non-intentional conduct. *See, e.g.*, Coffee County Compl. ¶¶ 302–03; Albany Compl. ¶¶ 382–83; Bradenton Compl. ¶¶ 303–04.

### C. <u>The Opioid Lawsuits Include Specific Allegations of Care Provided by the Plaintiffs to Individuals</u>

The Cobb County Complaints allege that the County treated individual people for the injuries they sustained as a result of opioid use or abuse. For example, the Original Complaint alleges that "EMS is at the front line of the opioid crisis, as they are the first on-scene responders to overdoses, deaths, and injuries related to opioid abuse." Orig. Compl. ¶ 647. It further alleges that "[o]pioid addiction and misuse also result in an increase in emergency room visits, emergency responses, and [EMT] administration of naloxone, the antidote to opioid overdose," *id.* ¶ 624, and that "[t]he County spends enormous sums for treatment programs, a large percentage of which is devoted to treating individuals with opioid-use disorder or dependence with programs for addiction treatment and recovery services . . . ." *Id.* ¶ 646.

Healthcare providers—not government entities—are the plaintiffs in two Opioid Lawsuits against Publix. *See* Exs. 35–38. These plaintiffs allege much of the same conduct on the part of Publix and other defendants and seek damages for unreimbursed costs of treatment for individuals arising out of the opioid epidemic. *See, e.g.*, Ex. 35 at ¶¶ 14, 243–44, Prayer for Relief.

## IV.   THE INSURERS' REFUSAL TO PROVIDE COVERAGE

Publix provided notice of the Opioid Lawsuits to the Insurers, *see* Ex. 12, and none of the Insurers responded that they believe they currently have or will have any obligation to defend Publix or pay Publix's defense costs. Many of the Insurers have affirmatively responded that they do not believe they have any coverage obligation to Publix with respect to the Opioid Lawsuits. Frenchman Decl. ¶ 9. In so doing, these Insurers have raised the same defenses raised by insurers across the country in response to claims for opioid liabilities. *See generally* Exs. 13–18.

For example, numerous Insurers have argued, erroneously, that there is no coverage for the Opioid Lawsuits because (1) they do not seek damages "because of bodily injury"; (2) they do not allege an "accident," and therefore are not claims for damages caused by an "occurrence"; and (3) the Expected/Intended Exclusions bar coverage. *See* Ex. 13 at 6–7; Ex. 14 at 22–23; Ex. 15 at 3; Ex. 16 at 5–7; Ex. 17 at 7; Ex. 18 at 8–9. To date, no Insurer has paid any amount toward Publix's defense costs in the Opioid Lawsuits. Frenchman Decl. ¶ 10.

## ARGUMENT

## I.   LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate only when the court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits. Fed. R. Civ. P. 56(a).

As this Court has explained:

> Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

*First Mercury Ins. Co. v. First Fla. Bldg. Corp.*, 2022 WL 4017061, at *2–3 (M.D. Fla. Sept. 2, 2022) (Honeywell, J.).

## B. Principles of Insurance Policy Interpretation

While the Druggists Policy does not contain a duty to defend, it nevertheless requires that The Hartford pay defense costs incurred by Publix in excess of the Druggists Policy's self-insured retention. *See supra* at 9. That distinction, however, does not affect the standard used to assess its defense obligation. "Where . . . an insurer has an obligation to reimburse an insured for defense expenditures in excess of an SIR Retention, the duty to reimburse is measured by the same standard as the duty to defend." *State Nat'l Ins. Co. v. White*, 2011 WL 5024258, at *5 (M.D. Fla. Oct. 19, 2011), *aff'd*, 482 F. App'x 434 (11th Cir. 2012). The remaining 2013 Policies contain a duty to defend. *See supra* at 9–10.

In *First Mercury*, this Court laid out the standard for evaluating the duty to defend under Florida law, first explaining the "eight corners rule," that the duty to

defend is determined solely by comparing the allegations of the underlying complaint to the policy at issue:

> Under Florida law, "the general rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the true facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses." *State Farm Fire and Cas. Co.*[ *v. Steinberg*], 393 F.3d 1226, 1230 (11th Cir. 2004), citing *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.,* 771 So.2d 579, 580–81 (Fla. 4th DCA 2000). This rule is known as the "eight corners rule," referring to the four corners of the underlying complaint and the four corners of the insurance policy. *See Addison Ins. Co. v. 4000 Island Blvd. Condominium Ass'n, Inc.*, 721 F. App'x 847, 854 (11th Cir. 2017).

2022 WL 4017061, at *4. The Court then explained that the duty to defend does not depend on the merits of the underlying allegations, and that "any doubt about the duty to defend must be resolved in favor of the insured." *Id.* If one claim in an underlying action is potentially covered under the policy, the insurer must defend the entire action. *See, e.g.*, *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 442–43 (Fla. 2005).

It is a matter of black-letter Florida law that if the language used in an insurance policy is plain and unambiguous, it must be interpreted according to that plain meaning in order to give effect to the language as written. *See, e.g.*, *Serendipity at Sea, LLC v. Underwriters at Lloyd's Subscribing to Policy No. 187581*, 56 F.4th 1280, 1285 (11th Cir. 2023). A policy's plain meaning "should be construed as it would be understood by an ordinary person." *People's Trust Ins. Co. v. Lamolli*, 352 So. 3d 890, 894 (Fla. 4th DCA 2022). The policy must be interpreted as a whole so as not to render any provision meaningless. *See, e.g.*, *U.S. Sugar Corp. v. Commerce & Indus. Ins. Co.*, ___ F. Supp. 3d ___, 2022 WL 17403613, at *6 (S.D. Fla. Dec. 2, 2022). If the language is

susceptible to more than one reasonable interpretation, it is ambiguous, and must be interpreted "liberally in favor of the insured and strictly against the insurer." *Serendipity at Sea*, 56 F.4th at 1285–86 (quoting *Roberson v. United Servs. Auto. Ass'n*, 330 So. 2d 745, 746 (Fla. 1st DCA 1976)).

As noted above, several of the Insurers have raised exclusions in the Policies as defenses to coverage. The above principles of interpretation are applied even more strictly against insurers in the context of policy exclusions. *See, e.g.*, *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) ("In fact, exclusionary clauses are construed even more strictly against the insurer than coverage clauses."). "When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006).

## II.   THE INSURERS HAVE AN OBLIGATION TO DEFEND OR PAY PUBLIX'S DEFENSE COSTS IN THE OPIOID LAWSUITS

The Insurers have raised the same defenses to coverage for Publix's claim as have been raised by insurers in many other cases across the country in response to opioid-related claims: (1) that the Opioid Lawsuits do not allege damages "because of 'bodily injury'" required to trigger the Policies' coverage; (2) that because the Opioid Lawsuits allege intentional or knowing conduct by Publix, they do not constitute an "accident" and therefore do not satisfy the Policies' definition of "occurrence"; and (3) the related argument that these allegations of intentional conduct trigger the

Policies' Expected/Intended Exclusions. For the reasons explained below, these positions must be rejected: the extensive allegations in the Opioid Lawsuits of injury, sickness, disease, and death are allegations of damages "because of 'bodily injury,'" and the allegations of non-intentional conduct constitute an "occurrence" and do not implicate the Expected/Intended Exclusions.

While there has been a split of authority nationally on these issues, neither the Florida Supreme Court nor the Eleventh Circuit has decided them,[6] and the more persuasive authority supports a finding that Publix's claim is covered under the Policies. The Opioid Lawsuits allege a potentially covered claim, therefore the Insurers have a duty to pay Publix's defense costs and/or defend Publix in the Opioid Lawsuits.

**A.** **The Opioid Lawsuits Allege Damages "Because of Bodily Injury"**

The 2013 Policies provide coverage for claims alleging damages "because of 'bodily injury.'" *See supra* at 7–9. Other policies under which insureds have sought coverage for opioid liabilities provide coverage for damages "for" bodily injury. *See, e.g.*, *Anda*, 90 F. Supp. 3d at 1311 (quoting one policy at issue: "We will pay all **damages** that the insured becomes legally obligated to pay <u>for **bodily injury**</u> or **property damage** included within the **products-completed operations hazard.**" (underline emphasis added; bold terms in original)). Under Florida law, the Insurers' decision to use "because of" rather than "for" in their Policies must be presumed to be

---

[6] As mentioned *supra* and discussed in greater detail *infra*, the Eleventh Circuit has decided a case involving insurance coverage for opioid liabilities, but it expressly "decline[d] to reach the question of whether [the claims in the underlying opioid lawsuit] are 'for' or 'because of' bodily injury,'" and decided the case based on exclusions not present in Publix's Policies. *See Anda*, 658 F. App'x at 958.

intentional, and must be given effect. *See Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008). Florida defines "because of" to mean "caused by" or "by reason of." *See, e.g.*, *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 292 (Fla. 2007). And Florida courts have taken a broad view of "because of" in the context of the other coverage provided by the Policies, coverage for claims "because of 'property damage.'" *See, e.g.*, *Assurance Co. of Am. v. Lucas Waterproofing Co.*, 581 F. Supp. 2d 1201, 1215 (S.D. Fla. 2008) (holding attorney's fees and costs that an insured becomes obligated to pay constitute damages "because of" property damage).

The Opioid Lawsuits, including the Cobb County Action, seek damages from Publix "caused by" or "by reason of" "bodily injury," defined in the Policies to include bodily injury, sickness, disease, and death. The Opioid Lawsuits are filled with allegations about the injury, sickness, disease, and death that the opioid epidemic has caused in various communities: opioid overdoses, addiction, injuries to children and adults, increases in Hepatitis C, infants being born with NAS, and thousands and thousands of deaths. *See supra* at 13–18. It is this wide range of bodily injuries that has created the public nuisance for which the plaintiffs seek redress, including damages based on the treatment of those bodily injuries.

The Insurers' primary argument has been that the Policies only cover claims brought by certain types of plaintiffs, such as the injured individual him or herself suing Publix for costs incurred due to a prescription filled by Publix. But that is not what the Policies say. The fact that government entities and healthcare providers are the plaintiffs in the Opioid Lawsuits, and not the individuals who actually suffered the

bodily injury, does not matter because the Policies all state that "[d]amages because of 'bodily injury' include damages claimed by *any person or organization* for care, loss of services, or death resulting at any time from the 'bodily injury.'" Ex. 1 at § I(1)(f); Ex. 3 at § I(D) (emphasis added). Since it is impossible for an organization to suffer bodily injury, the Insurers' position makes no sense when viewing the Policies as a whole. Moreover, other aspects of the Policies similarly make clear that the Policies are intended to provide coverage for claims because of bodily injury even when the claim is not brought by the individual who actually suffered the injury.

For example, the Policies' pollution exclusions exclude coverage for claims "by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of 'pollutants.'" Ex. 1 at § I(2)(f); Ex. 3 at Endt. 20. The Insurers' position makes no sense in light of the pollution exclusions: if claims by governmental authorities were already excluded because the governmental authorities did not suffer the effects of pollutants themselves but had to step in to address the effects of pollutants on the community, then there would be no need for this specific language in the exclusions. *See U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 886 (Fla. 2007) ("[I]f the insuring provisions do not confer an initial grant of coverage for faulty workmanship, there would be no reason for [the insurer] to exclude damage to 'your work.'"). Moreover, there would also be no need for the Opioid Exclusion that began appearing in Publix's policies in 2018 that specifically

states it "CHANGES THE POLICY" and excludes claims brought by governmental entities. *Supra* at 11.

Publix's position harmonizes this language and makes clear that claims by governmental authorities arising out of actual bodily injury or property damage are covered, unless specifically excluded as in the case of the Policies' pollution exclusions (which are not applicable to Publix's claim for coverage for the Opioid Lawsuits) or the Opioid Exclusions in the later policies.

### 1. The Better-Reasoned Decisions from Across the Country Support Publix's Position

Publix's position is supported by numerous authorities that have considered virtually identical policy language and opioid lawsuit allegations. In the first case by a U.S. Court of Appeals to consider these issues, the Seventh Circuit in *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771 (7th Cir. 2016), considered virtually identical policy language and underlying allegations and found that the policyholder in that case was entitled to coverage for the opioid lawsuits it faced. The State of West Virginia sued the policyholder, a pharmaceutical distributor, "for contributing to the state's epidemic of prescription drug abuse" by "negligently distribut[ing] drugs." *Id.* at 773, 775. The State alleged that "money was spent caring for drug-addicted West Virginians who suffer drug-related injuries and cannot pay for their own care." *Id.* at 773. As described above, these are the exact allegations that Publix faces in the Cobb County Action and other Opioid Lawsuits.

And the case had virtually identical policy language as Publix has in its 2013

Policies:

> [The insurer] agreed to cover damages that H.D. Smith became legally
> obligated to pay 'because of bodily injury.' [The insurer] also agreed to
> defend H.D. Smith against any suit seeking such damages. The policy
> defines "bodily injury" as "bodily injury, sickness or disease sustained by
> a person, including death resulting from any of these at any time." And
> "damages because of bodily injury" include "damages claimed by any
> person or organization for care, loss of services or death resulting at any
> time from the bodily injury."

*Id.*

In finding that H.D. Smith's insurer owed coverage for the defense costs

incurred related to the suit, the Seventh Circuit explained: "The policy that [the

insurer] issued to H.D. Smith covers suits seeking damages '*because of* bodily injury.'

Such a policy provides broader coverage than one that covers only damages '*for* bodily

injury.'" *Id.* at 774. The court cited a prior decision in which it had described the

difference between "because of" and "for" bodily injury as follows:

> [A]n individual has automobile insurance; the insured individual caused
> an accident in which another individual became paralyzed; the paralyzed
> individual sues the insured driver only for the cost of making his house
> wheelchair accessible, not for his physical injuries. If the insured driver
> had a policy that only covered damages "for bodily injury" it would be
> reasonable to conclude that the damages sought in the example do not
> fall within the insurer's duty. However, if the insurance contract provides
> for damages "because of bodily injury" then the insurer would have a
> duty to defend and indemnify in this situation.

*Id.* at 774 (quoting *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 616 (7th Cir.

2010)). Despite incorporating this concept from *Medmarc*, a case in which the claim

for coverage was rejected, the Seventh Circuit explained that *Medmarc* "is readily

distinguishable" from the facts of H.D. Smith's claim for coverage for an underlying opioid lawsuit. *Id.* The underlying action in *Medmarc*, unlike the Opioid Lawsuits, contained "no claim of bodily injury in any form." *Id.* at 775.

The court held that H.D. Smith's claim was covered because "West Virginia alleged that its citizens suffered bodily injuries and the state spent money caring for those injuries—money that the state seeks in damages." *Id.* at 774. The insurer argued, as Publix's Insurers argue, that the State sought its own damages, not damages on behalf of its citizens, but the Seventh Circuit brusquely rejected that argument:

> But so what? [The insurer's] argument is untethered to any language in the policy.

*Id.* The same analysis applies here. There is no language in the Policies that states that opioid suits brought by government entities are not covered,[7] or that only certain types of damages sought in such suits are entitled to coverage. Where, as the insurer argued in *H.D. Smith* and Publix's Insurers argue here, an insurer attempts to write in terms excluding a loss after the claim is made, that attempt must be rejected. As the Seventh Circuit concluded in *H.D. Smith*, "the plain language of the policy requires [the insurer] to defend [the West Virginia suit]." *Id.* at 773. The same plain language requires the Insurers to defend Publix against substantively identical allegations here.

The findings in *H.D. Smith* have been echoed and reaffirmed by courts around the country. In *AIU Insurance Co. v. McKesson Corp.*, 598 F. Supp. 3d 774 (N.D. Cal. 2022), the court also considered substantively identical policy language: a duty to

---

[7] Until the implementation of the Opioid Exclusion in 2018 that explicitly barred such claims.

defend claims seeking damages "because of" bodily injury, bodily injury defined as "bodily injury, sickness or disease sustained by any person, including death," and the language that "[d]amages because of Bodily Injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the Bodily Injury." *Id.* at 779–80. And the court considered whether allegations in opioid lawsuits that are part of the Opioid MDL and have the same or similar allegations to those brought against Publix in the Opioid Lawsuits qualified for coverage under that language. *Id.* at 784–85. The *McKesson* court found that because "'the event precipitating the[ ] legal action' is bodily injury; '[t]he costs that result from such action are therefore incurred "because of" bodily injury.'" *Id.* at 785.

In rejecting the insurers' argument that there should be no coverage because the government plaintiffs themselves suffered no bodily injury, the court found that this argument "contradicts the policies' clearly defining 'because of bodily injury' to include damages 'claimed by any person or organization.'" *Id.* The court reasoned:

> Because bodily injury means harm to the corporeal body, and the policies specify that bodily injury is "sustained by a person" or "any person," no "organization" can itself suffer bodily injury under the terms of the policies. The policies nevertheless provide that damages because of bodily injury can include damages claimed by an organization.

*Id.* at 785–86 (internal citations omitted). The same language is present in Publix's Policies, and the reasoning applies with equal force here: the Policies clearly provide

for *any organization* to be able to bring a covered claim, and the plaintiffs in the Opioid Lawsuits all fall within that broad language.[8]

Multiple other courts have held that the allegations in opioid lawsuits under identical policy language also constitute claims for damages because of bodily injury. In *AmerisourceBergen Drug Corp. v. ACE American Insurance Co.*, 2020 W. Va. Cir. LEXIS 3 (Nov. 23, 2020) ("*ABDC*"), the Circuit Court of West Virginia summarized, again, nearly identical policy language to that used in the Publix Policies, but also stressed that the policy at issue "does not contain any term or condition that excludes or limits insurance coverage if the plaintiff in the underlying lawsuit is a government entity," "does not contain any term or condition that excludes or limits insurance coverage if the plaintiff in the underlying lawsuit did not directly suffer bodily injury or property damage," and "does not contain any term or condition that excludes or limits insurance coverage for 'economic losses' or 'economic damages.'" *Id.* at *9–10. The 2013 Policies similarly have no such language that would actually support the arguments that the Insurers have sought to make.

The *ABDC* court largely adopted the analysis in *H.D. Smith* that the fact that the claim for damages was by the state and not an individual made no difference for purposes of coverage, and agreed that "the contrary argument was 'untethered to any language in the policy.'" *Id.* at *19–20. The court then concluded that "[a]s a matter

---

[8] The *McKesson* court ultimately concluded that there was no coverage for the policyholder's claim because under California law, which materially differs from Florida law, *see infra* at 42–43, the allegations in the underlying suit did not constitute an "occurrence."

of law, these claims establish that the State of West Virginia claimed damages in the WVAG Lawsuit for 'bodily injury,' as that term is defined in the [relevant] Policy." *Id.* at \*23; *see also Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F. Supp. 3d 147, 166 (W.D. Pa. 2020) ("Despite the fact that the plaintiffs in the County lawsuits do not allege that *they* suffered bodily injury or property damage, they do seek damages *because* of bodily injury. Thus, the complaints in the County lawsuits allege bodily injuries, and arguably seek damages because of bodily injury, and the arguments to the contrary raised by [the insurers] are without merit."), *vacated on other grounds*, 2021 WL 6276267 (W.D. Pa. May 25, 2021).

These decisions all performed a careful analysis of identical, or substantively identical, policy language and underlying allegations as presented by Publix's Policies and the Opioid Lawsuits and found those allegations seek damages "because of bodily injury." The same result is warranted here: the Opioid Lawsuits seek damages "because of bodily injury" under the 2013 Policies.

### 2. The Contrary Authority, Including *Anda*, Is Distinguishable or Poorly Reasoned and Should Not Be Followed

One decision in Florida touches on the issues in this Motion—*Anda*—but it is distinguishable in a number of ways from this case. First, the facts of *Anda* are markedly different from this case. The policyholder in *Anda* was a manufacturer of prescription drugs that was alleged to have engaged in a "practice of unfettered distribution to 'pill mills,'" 90 F. Supp. 3d at 1311, unlike Publix, which operates retail pharmacies at the heart of the communities it serves and fills prescriptions for

pharmacy customers. Moreover, the policy language at issue in *Anda* was different in the key respect that most of the policies in *Anda* covered claims "for bodily injury" rather than "because of bodily injury." *See id.* at 1311, 1316, 1318.

The district court analyzed policies issued by four different insurers—Gemini, Federal, St. Paul, and Travelers—in that order. The Gemini, Federal, and St. Paul policies only provided coverage for claims seeking damages "for bodily injury." *See id.* The court analyzed that language first, and only at the end of its decision did it come to policies that included the language "because of bodily injury." The court then addressed the two concepts as one, concluding that there was no "appreciable" difference between "for" and "because of" language without any analysis of the above-cited Florida law, and without any consideration of the principles of insurance policy construction that prohibit giving distinct terms the same meaning. *Id.* at 1318.

Second, the authority the *Anda* district court relied on is not only distinguishable, but it has been distinguished by the very court that issued the authority in the first instance. The *Anda* court relied heavily on *Cincinnati Insurance Co. v. Richie Enterprises, LLC*, 2014 WL 3513211 (W.D. Ky. July 16, 2014), explaining that it found that decision "persuasive." 90 F. Supp. 3d at 1314. In that unreported decision, the Western District of Kentucky based its ruling that underlying opioid lawsuits did not allege damages because of bodily injury on the Seventh Circuit's decision in *Medmarc*, 2014 WL 3513211, at *5, which, as described earlier, the Seventh Circuit itself subsequently ruled is inapplicable in the context of opioid liabilities because the claim in *Medmarc* did not allege any damage because of bodily injury, whereas the opioid

lawsuits do allege damages because of bodily injury.[9] Thus, the *Anda* court merely continued an error that the *Richie* court made in the first instance, which the Seventh Circuit has subsequently explained.

Finally, not only did the Eleventh Circuit explicitly not reach the district court's finding as to whether allegations in the opioid lawsuits at issue sought damages "for" or "because of" bodily injury, 658 F. App'x at 958, the basis on which it did rule is indicative that it believed that the opioid lawsuits in that case *did* seek damages "for" or "because of" bodily injury.

The district court had ruled that "Products Exclusions" in the St. Paul and Travelers policies, which barred coverage for "bodily injury . . . that results from your products," did not apply to bar coverage for Anda's claims because the underlying lawsuits did not allege "bodily injury." 90 F. Supp. 3d at 1318. The Eleventh Circuit disagreed, basing its affirmance solely on its finding that these Products Exclusions *did* apply to Anda's claims. 658 F. App'x at 958. This indicates that the Eleventh Circuit believed the lawsuits did allege "bodily injury" for two reasons: (1) as a matter of basic policy construction, there is no need to reach exclusions if the policy's insuring agreement is not satisfied, *J.S.U.B.*, 979 So. 2d at 879–80; and (2) for these exclusions to apply, as the district court found, there needs to be a claim seeking damages "for"

---

[9] *Richie* also relied on another Seventh Circuit decision, *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center*, 566 F.3d 689 (7th Cir. 2009), which, like *Medmarc*, did not allege any "'bodily injury to the residents'" but instead sought statutory damages for false billing. *Id.* at 694–95.

or "because of" "bodily injury" in the first place. 90 F. Supp. 3d at 1318. The Eleventh Circuit found that the exclusions applied. 658 F. App'x at 958.

The Supreme Court of Delaware's recent decision in *ACE American Insurance Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022), which Insurers are very likely to rely on, suffers from the same flaws as *Richie*, in that it relied heavily on the Seventh Circuit's decisions in *Medmarc* and *Momence Meadows* in finding that opioid liabilities are not covered under the policies at issue. *Id.* at 249–50. The Seventh Circuit explained in *H.D. Smith* why *Medmarc* was inapplicable, and the same distinction applies to *Momence Meadows*.[10]

The *Rite Aid* decision was also subject to a vigorous dissent, which highlights the weaknesses of the majority's position. Whereas the majority held that covered claims can only be brought by (1) the person injured, (2) a person recovering on behalf of a person injured, or (3) people or organizations who treated the person injured, the dissent bluntly pointed out that "[t]he policy does not contain such language. The policy covers damages claimed by *any* organization for the care of a person injured by Rite Aid." *Id.* at 256 (Vaughn, J., dissenting). The dissent distinguished *Richie* and *Medmarc* for the same reasons as the courts above, and opined that *H.D. Smith* is

---

[10] The *Rite Aid* majority also focused on the fact that the opioid lawsuit before it specifically disclaimed seeking damages for personal injury. *See, e.g., id.* at 245. While certain of Publix's Opioid Lawsuits have similar allegations, the Cobb County Action does not, and judges have been skeptical that those allegations, "apparently a pleading tactic made to avoid" a statute of limitation in an applicable statute, should have any impact on the coverage analysis. *See id.* at 255–56 (Vaughn, J., dissenting).

"virtually indistinguishable from this case, and the result should be the same here." *Id.* at 256–58 (Vaughn, J., dissenting).

The decisions by the Supreme Court of Ohio in *Acuity v. Masters Pharmaceutical, Inc.*, ___ N.E.3d ___, 2022 WL 4086449, 2022-Ohio-3092 (Ohio Sept. 7, 2022), and the Sixth Circuit in *Westfield National Insurance Co. v. Quest Pharmaceuticals, Inc.*, 57 F.4th 558 (6th Cir. 2023), both of which found that opioid lawsuits did not allege damages "because of bodily injury," are also based on flawed reasoning that should not be followed in this case. The decisions are based on the conclusion that the government plaintiffs in the opioid lawsuits at issue did not seek damages for any bodily injury to any particular person. *See Acuity* ¶¶ 23, 25; *Westfield*, 57 F.4th at 563 (stating opioid lawsuits sought damages for "many indeterminate injuries"). The *Westfield* court stated that "[a]ll parties agree that the lawsuits allege no particular injury to any particular person." 57 F.4th at 564.

Those courts found that the myriad allegations of bodily injury, sickness, disease, and death caused by the opioid epidemic (and allegedly by the policyholder's conduct) in the plaintiffs' communities merely "provide context" for the public nuisance and other causes of action asserted by the plaintiffs. *See Acuity* ¶ 24. Those allegations, therefore, did not have a sufficient connection to any bodily injury to qualify for coverage. *See id.* ¶ 36 ("We therefore conclude that the phrase 'damages because of bodily injury' in the policies before us requires more than a tenuous connection between the alleged bodily injury sustained by a person and the damages sought."); *Westfield*, 57 F.4th at 562–63 (finding the opioid plaintiffs' claims "detached

36

from any underlying physical harm"); *id.* at 565 (finding that the allegations of bodily injury were only "tangentially related" to the plaintiffs' claims). The *Acuity* majority decision specifically adopted *Rite Aid*'s three classes of covered plaintiffs, *id.* ¶ 36, and relied on *Richie* and *Momence Meadows*, *id.* ¶ 24, despite the fact that the *H.D. Smith* court distinguished those cases.

As in *Rite Aid*, the decision in *Acuity* was also the subject of a strong dissent by two justices, which stated that "the majority opinion ignores blackletter law and the plain language of the policies." *Acuity* ¶ 46 (Stewart, J., dissenting).

> The majority's assertion begs the question: what language would have been sufficient, when the policies expressly provide for that precise coverage (bodily injuries on or after July 26, 2010, that occurred in the governmental entities' jurisdictions)? Nothing in the policy language requires that the claimant bringing the suit seek to recover the costs of the claimant's own bodily injury. And had Acuity wanted to exclude coverage for losses claimed by entities because of bodily injury suffered by third persons, or claims brought by governmental entities, it could have said so, but it did not. . . . And the policies themselves cover liabilities to organizations (like governmental entities), which cannot personally suffer "bodily injuries."

*Id.* ¶ 49 (Stewart, J., dissenting). The *Acuity* dissent found that the majority interpretation adopting the *Rite Aid* classes of covered plaintiffs "adds words to the policies; the language in the policies does not specify who, or whether a particular claimant, must suffer the bodily injury for coverage." *Id.* ¶ 50 (Stewart, J., dissenting). Like the Seventh Circuit, the dissent found the majority's interpretation "untethered to any policy language." *Id.* ¶ 53 (Stewart, J., dissenting).

The courts in *Rite Aid*, *Acuity*, and *Westfield* drew a distinction in terms of scope in reaching their decisions: they found that an underlying claim could allege damages

"because of bodily injury" when it presented allegations of one, specifically identified injury, and a plaintiff who had to prove that specific injury to recover the damages it sought. But when a claim, like the Opioid Lawsuits, presents allegations of thousands of injuries—here injury, sickness, disease, and death in the plaintiff jurisdictions—those courts found the suits did not allege damages "because of bodily injury" because the injury was not particularized enough.

A hypothetical first used by the Seventh Circuit in *H.D. Smith* has been discussed in *Rite Aid*, *Acuity*, and *Westfield*: that of a mother who incurred costs caring for her son's opioid-related injuries and brought a claim against the policyholder for those costs. 829 F.3d at 774–75. The *H.D. Smith* court found that there would be no difference between the hypothetical mother and the government plaintiffs in the opioid lawsuits, and that both claims are covered under the policy language at issue here. *Id.* at 775. The *Rite Aid*, *Acuity*, and *Westfield* courts state that the mother's claim is covered because it depends on proof of the injury sustained by the son, whereas the opioid lawsuits do not rely on allegations of injury to particularized individuals. *See, e.g.*, *Acuity* ¶¶ 38–39.

But that distinction finds no basis in the allegations of the Opioid Lawsuits. The Opioid Lawsuits clearly depend on proof of the bodily injuries sustained by individuals within their jurisdictions. That is the backbone of the public nuisance claim asserted by jurisdictions like Cobb County. If Publix could prove that there was no nuisance created by opioids and no proof to support the allegations of the plaintiffs that opioids created a wave of overdoses, addiction, disease, and death, Publix would face no

potential liability. Regardless of the ultimate proof of bodily injury, in the context of evaluating a duty to defend, the plaintiffs' allegations must be taken as true.

In the Opioid Lawsuits, the plaintiffs provide statistics about the toll of the epidemic in terms of the many thousands of people addicted to opioids, suffering from opioid use disorder and other diseases like NAS or Hepatitis C, who suffered overdoses, and the many thousands who have died. They do not list the specific individuals by name, or allege who became addicted and when, and who died and when, but that is not necessary. Those individuals still represent particularized instances of bodily injury. As the *H.D. Smith* court found, there is no difference between a mother seeking to recover her costs caring for one opioid-addicted person, her son, and the Opioid Lawsuit plaintiffs seeking to recover the costs of caring for thousands of unnamed opioid-addicted people in their jurisdictions. The Opioid Lawsuits are therefore covered under the identical language in the Publix Policies.

The *Rite Aid*, *Acuity*, and *Westfield* courts struggled with this issue of scope, and created classes of covered plaintiffs not found anywhere in the policy language at issue in those cases, or the Publix Policies, to narrow the scope of covered claims. The *Acuity* court specifically stated it was concerned about the "floodgates" that could open if it did not create those classes of covered plaintiffs. *Acuity* ¶ 39. But, as courts including the *H.D. Smith* and *ABDC* courts have found, adopting that interpretation "untethered to the policy language" is contrary to principles of insurance policy interpretation. In fact, the policy language in these cases, and the language in the Publix Policies, specifically contradicts any effort to create classes of covered plaintiffs because the

Policies specifically provide that covered claims for damages "because of bodily injury" can be brought by "*any person or organization.*"[11]

None of Publix's Policies have any provision stating that a claim is not covered merely because it alleges damages based on bodily injury to too many individuals to practically identify by name. The fact that the Opioid Lawsuits present allegations of significant bodily injury throughout the plaintiffs' communities does not expose the Insurers to limitless liability or any kind of liability for which they did not bargain. Each Policy has limits of liability, which the Insurers put in place as the maximum amount they would cover for any one claim. Where, as here, a claim presents significant exposure and requires a vigorous defense, one or more of those limits may be exhausted—but that is precisely why Publix paid the premiums it did. The Opioid Lawsuits seek damages "because of bodily injury" and therefore are covered under Publix's Policies and the Insurers must pay Publix's defense costs subject only to their respective attachment points and limits of liability.

### 3.  If the Policies Are Ambiguous, Publix Is Entitled to Coverage

For the reasons described above, Publix's interpretation that the Opioid Lawsuits are potentially covered under the 2013 Policies such that the Insurers have a defense obligation is the only interpretation that accords with the plain language of the

---

[11] While the *Westfield* court attempted to address this language by stating that "this definition was meant to include derivative claims, like loss of consortium claims by family members, and subrogation claims, often brought by 'organizations' such as insurance companies, that are directly related to and dependent on the existence of a particular bodily injury or injuries," 57 F.4th at 566, the language used is nowhere near so narrow. It applies to *any person or organization* bringing such claims, not just family members or insurance companies. But the healthcare provider suits against Publix fall into these categories even if the Court finds they are so dramatically limited. *See generally* Exs. 35–38.

Policies and reads the Policies as a whole and in harmony, and multiple courts have endorsed that interpretation. However, even if the Court finds the Insurers' position and/or the positions of the *Rite Aid*, *Acuity*, and *Westfield* courts are also reasonable, that only creates an ambiguity that must be resolved in Publix's favor under Florida law. *See supra* at 22–23. This is particularly true in the context of the duty to defend. Florida law provides that an insurer's duty to defend is triggered if the allegations are *potentially* covered. *See supra* at 22. An insurer is required to resolve uncertainty in the law at the time the defense is requested in favor of providing a defense to its insured. *See, e.g.*, *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1246 (11th Cir. 2015). Multiple courts across the country have reasonably interpreted the allegations in the Opioid Lawsuits to be potentially covered under the policy language, lending support to Publix's position that the policy language is at least ambiguous as to defense coverage for the Opioid Lawsuits, requiring the Insurers to defend.

**B.  <u>The Opioid Litigations Satisfy the Definition of "Occurrence"</u>**

The Druggists Policy defines "occurrence" as "an accident," the Liberty Mutual Policy adopts that definition, and the ACE Excess Policy uses a virtually identical definition. *See* Ex. 1 at § V(15); Ex. 2 at Endt. 12; Ex. 3 at § VII(O). The Insurers have taken the position that because the Opioid Lawsuits allege intentional conduct on behalf of Publix, the conduct cannot be considered an "accident," and therefore any bodily injury alleged in the Lawsuits was not caused by an "occurrence." This argument fails because it ignores the substantial allegations of negligent or otherwise non-intentional conduct in the Opioid Lawsuits. *See supra* at 18–19 (describing

41

allegations that Publix failed to implement controls to identify suspicious orders or to avoid diversion of opioids).

These allegations support the negligence claim asserted at the outset of many of the Opioid Lawsuits, as well as the public nuisance claim, which can be based on negligent conduct. These allegations of non-intentional conduct are allegations of an "accident," and therefore an "occurrence" under the applicable Policies. Florida law provides that where an underlying complaint alleges that the policyholder did not act with intent to cause the alleged resultant harm, those are allegations of an accident, and therefore an occurrence, even when the acts themselves are deliberate. *See, e.g.*, *FCCI Ins. Co. v. Horne*, 890 So. 2d 1141, 1144 (Fla. 5th DCA 2004) (finding coverage for an "accident" in the absence of allegation of intent to harm, even where the conduct was substantially certain to result in injury: "liability policies covering 'accidents' apply to injury or damage caused by the insured's intentional acts *so long as the insured did not intend to cause any harm*"); *Allstate Ins. Co. v. Steinemer*, 723 F.2d 873, 875 (11th Cir. 1984) (finding potential coverage where "the insured intentionally does an act, but has no intent to commit harm" (citations omitted)).

Multiple cases that have addressed this argument in the opioid context have found that similar allegations mean that identical definitions of "occurrence" are satisfied. In *Liberty Mutual Fire Insurance Co. v. JM Smith Corp.*, 602 F. App'x 115 (4th Cir. 2015), the Fourth Circuit focused on the "occurrence" argument under a similar definition. The court stated that, under South Carolina law, "accidents require that either the act or the injury resulting from the act be unintentional." *Id.* at 120. This is

the same standard as Florida law, as explained above. Looking at the underlying allegations, the court concluded that, even if the policyholder's acts of distributing opioids were intentional, "the violations described still amount to a failure to take reasonable care to prevent harm. The public nuisance claim effectively alleges that the defendants knew certain drugs were ones that were abused, and then continued to distribute them without effective controls— . . . preventable but unintentional harm."

*Id.* In sum, the court stated:

> [T]he defendants here were engaged in the lawful activity of providing prescription drugs to pharmacies. They may not have been sufficiently careful about whose hands the drugs eventually reached, but that does not preclude finding accidental injury. . . . [I]t is at least possible that the state court will find that the defendants did not take sufficient care to catch suspicious activity and therefore accidentally caused harm to prescription drug abusers and the state . . . . Therefore we hold that there is at least a possibility of coverage under the . . . policy, and [the insurer] thus has a duty to defend [the policyholder] in the underlying action.

*Id.* at 121–22. These are the same allegations that Publix faces in its Opioid Lawsuits, and, for the same reasons, they allege an "accident," and therefore an "occurrence." *See also Giant Eagle*, 499 F. Supp. 3d at 168 (holding that similar allegations and claims of negligence, "which clearly do not involve allegations of intentional conduct, sufficiently allege an ['accident' or] 'occurrence'").[12]

---

[12] As noted above, the court in *McKesson* found that the allegations in the opioid lawsuits it analyzed did not constitute an "occurrence," but it did so under California law, which is that any allegation of an intentional act cannot give rise to an "occurrence" even if the resulting injury was not intended by the policyholder. 598 F. Supp. 3d at 788–89. This is different from Florida law, as explained above, and the law in *JM Smith* and *Giant Eagle*.

Finally, the Supreme Court of Florida has already found that the term "accident" in an identical definition of "occurrence" is ambiguous and must be construed in favor of coverage. *See State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998) ("We hold that where the term 'accident' in a liability policy is not defined, the term, being susceptible to varying interpretations, encompasses not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured."). To the extent this Court finds the definition of "occurrence" to be ambiguous, a similar result must follow here.

## C. The Expected/Intended Exclusion Does Not Apply to Preclude Defense Coverage

The Insurers argue that the Expected/Intended Exclusion applies for the same reason that they argue that the Opioid Lawsuits do not allege an "occurrence": because the Opioid Lawsuits allege intentional conduct by Publix. For the same reasons as above, that argument fails because it ignores significant allegations of negligent or otherwise non-intentional conduct in the Opioid Lawsuits. Moreover, Florida courts have applied the Expected/Intended Exclusion narrowly and have distinguished between allegations that a defendant acted intentionally versus allegations that a defendant intended to cause harm. *See, e.g.*, *CTC*, 720 So. 2d at 1076 (allowing coverage for an insured's intentional acts where the insured's acts resulted in unexpected injury or damage).

The only exclusion that would potentially apply to bar coverage for the Opioid Lawsuits is the Opioid Exclusion, but that Exclusion was not in place until 2018, years

after the 2013 Policies. The Expected/Intended Exclusion does not apply based on its plain language and the allegations in the Opioid Lawsuits, which allege both intentional and non-intentional conduct, and the allegations of non-intentional conduct require the Insurers to defend all allegations in the Opioid Lawsuits. *See Jones*, 908 So. 2d at 442–43. Thus, the Insurers cannot meet their heavy burden to prove that the Expected/Intended Exclusion applies. *See, e.g.*, *Beaver*, 466 F.3d at 1296 ("When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation.").

## CONCLUSION

For the foregoing reasons, Publix respectfully requests that the Court grant its motion for partial summary judgment and declare that the 2013 Insurers have an obligation to provide coverage for Publix's defense costs for the Opioid Lawsuits.

Dated: April 3, 2023

*/s/ Kenneth H. Frenchman*
Kenneth H. Frenchman (*pro hac vice*)
Alexander M. Sugzda (*pro hac vice*)
Jason D. Meyers (*pro hac vice*)
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1325 Avenue of the Americas
New York, New York 10019
Tel: (212) 584-1890
Fax: (212) 584-1891
kfrenchman@cohenziffer.com
asugzda@cohenziffer.com
jmeyers@cohenziffer.com

Robert H. Friedman (FBN: 25994)
FRIEDMAN P.A.
340 Royal Poinciana Way, Suite 317-202
Palm Beach, FL 33480
Tel: (561) 800-2110
Fax: (561) 246-3413
rob@friedmanpa.com

*Attorneys for Publix Super Markets, Inc.*